is Trahanas v. Northwestern University. Mr. DeRose, there's a switch on the right side by which you can lower the podium. Judge, I can raise my chair. I don't want to mess up. Your choice. Mr. DeRose. Thank you. Good morning, Your Honors. Judge, this is a case that the written facts of the various complaints never changed, by even one word. What only changed were the counts when I found out, finally, after two years and seven months of it having been written, I finally got the words that Dr. Schwartz had written to the medical schools to deprive Ms. Trahanas of her chance ever to practice medicine. He had written a great letter of recommendation. All of his letters of emails over the years that she worked for him, he called her great. He said, you're the best. He acknowledges that in the one year before she came to work for him, he had not been published. Once she came there, they were published five times in a medical journal called Shock, that studies the traumatic brain injury in mice to probably try to help us in our problems in the world with traumatic brain injury. But the way Northwestern handled this matter, and it all takes place within about four weeks, three weeks, Trahanas is being ridiculed and mocked by Dr. Schwartz despite her contribution for him, where she would keep his laboratory going and open all month long, although he had to be away for half of the month to tend to clinical duties at Northwestern University Hospital. When finally Diane was being ridiculed for being a lesbian, he said, because although she's a very attractive young lady, she never got married. She was playing sports. So he used these little code words like softball player and made comments. Other doctors who were working in the laboratory, there were actually three different panels of doctors who had their different research going on all in the same room. And what happened was other doctors gave us affidavits for the judge to consider on summary judgment saying they could see in the room the embarrassment, the humiliation that Diane was experiencing. She never reported this to Northwestern because they would have had to take action. Isn't that a key point though, Mr. DeRose, the lack of reporting? It is, Judge, but it's excused. Has the Supreme Court ever held that noncompliance with its Farragher Doctrine can be excused? I don't know that, Judge, but I do know that the Seventh Circuit has, and I don't have the names of the cases, but I cited them in my book. The Supreme Court held in Farragher that an employer can require reporting and it has a defense if the employee does not report and there's no adverse action and there was no adverse action, your client got racist. That looks like a straightforward application of the Supreme Court's holding in Farragher. But, your Honor, that looks away from all the other problems that they had in this case. She wasn't just, she didn't report it, but it was being done in front of her. One supervisor was doing it and another Dr. Perlman was observing it. He had a duty to report it. He never reported it. The other doctors who gave us the affidavit said, we were offended by it, we thought the treatment by the doctor was that bad. But all of that, Judge, comes to a head when Diane, her psychiatrist says, that place, because of what your supervisor and two coworkers are doing to you, is not a good place. You've got to take FMLA leave. You've got to get your act together. Diane takes the leave and two days later, I know I've argued cases before these panels many times about how soon do you show that the closeness in time is important. How about two days after she takes her leave? He writes that letter to the medical schools withdrawing a brilliant letter where he said she has mastered the art of surgery on these mice and their brains. She is going to be wonderful. And the experts for the defendant called in the case, which the judge relied on. They said, we don't expect people who are going to go to medical school to have been published even once. She has a cover on Shock Magazine and four other contributing articles. And what do the witnesses for Northwestern do? They make fun of their oath to tell the truth, pretend like they don't even recognize their own e-mails, their own handwriting, all of those things. A jury should be allowed to consent. And if given that opportunity, I suggest to your honor, we will prevail. But we have been deprived of that opportunity because the trial judge decided the facts. He decided who was telling the truth. But how can people who say I don't recognize my own handwriting or I don't remember hearing Diane complaining because she's having a problem with her experiment and what they're really saying, they were sabotaging her experiments and all Dr. Perlman said was, you shouldn't do that. You should give her the right cocktail to use. All of this should have been reported. But the biggest problem is the defamation of a young, brilliant scientist career because she took FMLA leave. They made fun of her because she was riding some kind of a bus because she was off her meds. Diane, take your meds. And they're laughing at her. Her psychiatrist says she was going through some very, very trying situations. Those are all in the record. And a jury hearing this stuff, they're going to get insulted at what Dr. Schwartz did when he, out of anger and rage, wrote that letter withdrawing her support. It took him two years and seven months to finally give me a copy of that letter. 23 months. I'm sorry, your honor. It seemed, Mr. DeRose, that Ms. Trahanis had a working relationship with HR at Northwestern, at least with regard to the FMLA. Why not make the complaints that you're detailing here to that HR department and have that HR department advocate on her behalf? That I, as her lawyer, should have? No, why doesn't she do that, even before you're retained? Why doesn't she go to Northwestern HR and say, they're creating this type of environment for me, they're saying these things? She did, your honor. On the 20th, he writes the letter on the 19th of February. On the 20th of February, they're already alerted by Diane Trahanis, I got a notice from the AMCAS that he filed another letter, and he won't tell me about it, I don't know what it's about, can you help me? And they write her back, and don't make them angry, but go ahead and ask them, and we'll keep you advised. What we find out, which they never do. Why? Because they're covering it up. We've got their handwritten notes from a meeting with Chris Sharpelli, who is the director of the hospital. He told, on the very next day, or two days later, because Dr. Schwartz says he was driving home when he got these messages, cease and desist, he's told, people might not understand what you're talking about, might not understand, they will completely understand, and they'll be angry about it. Mr. Jarosz, on the FMLA claim, you've made, in general terms, some arguments about Mr. Hanus's attempts to seek other employment after that FMLA leave. Did you provide any specifics, specific instances, or jobs that she sought in the record before the district court? Yes, Judge. The judge got the list, the same list that I provided with my brief, 47 applications for any other job at Northwestern as a Tech 2 or a Tech 3 or just a research technician. Why? Because her doctor, Dr. Kano, was saying, you cannot go back in that workplace. You'll have a decomposition of your psychiatric problem. All of this is so very important. This young lady worked very hard and made that particular portion of the lab excel, and he made fun of her, and she put out, between May and October, Your Honor, she put out 47 applications, and they didn't even put her in any. What is a problem for them? When she got off FMLA leave, they did not give her her job back or equivalent job. She could not go back to Dr. Schultz. There is no question, according to her psychiatrist. But they surely have one of those 47 openings that they could have sent her back to. She's out of that area now, Your Honor, because she couldn't get a job again in the medical science field. Published, re-published on five articles, and now she's doing other work, trying again to find a way to rebuild herself to go back to medical school. And when we talked about the question, why didn't she report it to Northwestern, what he was doing to her, she had the perfect reason, that the Seventh Circuit has acknowledged. She had an ulterior motive. She needed those letters of recommendation from Dr. Schultz and from Dr. Perlman. She did not want to be called a troublemaker, a whiner, or a complainer. She acted as every human being we could think of would have acted, in her circumstance. She's not going to complain about sexual harassment when she's trying to get approved, get those letters of recommendation. It just screams at all of us that she is doing what we would expect, and His Honor just kind of lost over all of it and said she didn't suffer any, she suffered a loss, all right. She had no job afterwards, all done. She's not at Northwestern, she's not in science anywhere anymore. She lost her job, and she also lost her good name as a scientist because he made up that phony story and it didn't come up until his death when we gave him a chance to question her again. The defense had not one question for her. He said, oh, well, I had to withdraw that letter because I couldn't find any notation that she gave that claudidite. Thank you, Mr. DeRose. Thank you, Judge. Ms. Wormuth. Good morning. May it please the Court, I represent Northwestern University and Dr. Stephen Schultz. The appeal is actually much more narrow than what you heard presented by Mr. DeRose this morning. Many of the purported facts being argued relate to claims and rulings on claims that Diane Trehanos did not appeal. For one, she did not appeal the defamation claim against Dr. Schultz. It is not included in her notice of appeal. Did she appeal the judgment? No, she appealed... If you look at her notice of appeal, when she appeals the December 23, 2020 order on the original summary judgment motion, she appeals only from the judgment entered against Northwestern. Under Rule 3C-5, did she submit, did she appeal an order described in Rule 4A-4A? She did appeal the order, so she mentions docket number 133, but she carves out of that order, and I can cite to you how she words it, but she carves out of that order any ruling against Dr. Schultz. So she says... Where does she carve this out? In the notice of appeal. So this is the short appendix 97. She says that she's appealing from the orders by His Honor Judge John J. Tharp Jr. granting summary judgment to Northwestern University, entered in this action on December 23, 2020, and Stephen Schultz, M.D., entered in this action on July 8, 2021. So the only... So what do you make of Clause 6, which says an appellant may designate only part of a judgment or appealable order by expressly stating that the notice of appeal is so limited, but without such an express statement, specific designations do not limit the scope of the notice of appeal? I would argue that this has been limited by the express terms of her notice of appeal. What is it? You're going to have to try again. It says it's appealing the summary judgment to Northwestern University and Stephen J. Schultz. Right? I don't see any language saying, and we're not appealing X. What I would argue, Your Honor, is that with respect to Docket 133, the summary judgment, the original summary judgment order entered on December 23, 2020, she limits that to the judgments entered on behalf of Northwestern University. That's exactly what Clause 6 is intended to prevent, this kind of confusion and limitation. I think you should proceed to the rest of your arguments. Okay, I will proceed, because even if those claims have not been appealed, judgment is still appropriate. You should assume for this purpose that the entire case is on appeal. I will do that, Your Honor. As the district court noted, and as I think we saw here with argument from Mr. DeRose this morning, Diane Trehanos really fails to grapple with the legal technicalities of her claims. Her appeal boils down to, I experienced a lot of really unpleasant things in this laboratory. I was ridiculed, I was mocked, I was besmirched. My professional reputation was harmed. But she doesn't tether those facts, or she only loosely tethers them, at least, to conflated legal theories. And if you strip through those loosely tethered facts and get to the undisputed material facts and apply those concepts to her legal claims... And by the way, the legal issues involved here are not novel. Once that exercise is undertaken, we submit that this court should affirm the grant of judgment to both appellees on all of her claims. I'll turn briefly to Diane Trehanos' Title VII Hostile Work Environment Claim against Northwestern, which is premised upon the sex-stereotyping comments only. We don't get to judgment... I'm sorry, we don't get to comments about struggle boss and taking your meds and that sort of mockery, as she would describe it, because the Hostile Work Environment Claim based on the Americans with Disabilities Act, that claim was dismissed in 2017 and never replied, never again assorted in this case. So if we look at the sex-stereotyping comments, as Mr. Jarosz has acknowledged here today, the plaintiff did not report those comments, despite, as Judge Brennan asked, interacting significantly with human resources on a variety of topics, including her FMLA leave, her raise, and her promotion. The notion that she could be excused from reporting those issues because she wanted favorable letters of recommendation, the law does not accept that. In fact, this court has expressed, I think it's Shaw v. Autozone, that some unsubstantiated fear of retaliation or some bad conduct arising as a result of the complaint does not absolve the individual of taking advantage of the systems put in place by the employer to make sure that it is doing everything that it can to eradicate that type of commentary. I'm lost. I'm sorry? Ellerth and Farragher don't require anyone to report anything. They create an affirmative defense. The right in question is the right of the employer. You're phrasing it as if it were a duty on employees. It's not. I will say this. Under the affirmative defense, you're absolutely right, Your Honor, the employer has the obligation to present facts proving that it has substantiated the implication of that defense. The employer has a certain entitlement under the statute, right? Yes. That's what the Supreme Court held. Yes. And in connection with that, the employer has to do two things. One is it has to create mechanisms to allow for the reporting of claims, and then it has to take prompt remedial action if those complaints are made. And the facts that are undisputed here are that Diane Trehanas acknowledged that the university, in fact, did have a policy in place. The policy prohibited harassment in the workplace. The policy provided for reporting mechanisms, including mechanisms that went outside of the chain of command. She acknowledged all of that. She got that handbook. She admitted on the first day of employment. She signed her acknowledgment form, indicating that she knew she could talk to HR about these issues. And then she admitted, as Mr. DeRose explained, that she never reported this to anyone within management in the laboratory, the medical school, or the human resources office. And as a result of that, we think that Judge Tharp correctly applied that affirmative defense and ruled in Northwestern's favor on the hostile work environment claim. Ms. Wormuth, could I ask you about Dr. Perlman? Yes. And how important his testimony is to support the grant of summary judgment in this case? I think his testimony, we would argue, is almost immaterial here. Did you submit it as part of the motion? I don't think we relied on Dr. Harris's testimony at all, Your Honor. Dr. Perlman? I'm sorry. His first name is Harris. Dr. Perlman. So I have to say, I don't think I've ever seen a witness testify in his transcript that he, under oath, that he did not remember his CV and did not remember ever teaching at the university where he's on the faculty. Right. So being on the faculty in the medical school doesn't necessarily put you in a classroom. So it's sort of a unique faculty appointment. That being said, his testimony is not material. We heard about these affidavits today from Mr. DeRose. These affidavits that were submitted, one was submitted by a friend who never worked in the lab and didn't witness any of this, only heard about it secondhand. The two others that worked in the lab, they attested to hearing the comments about the struggle boss or other sort of silliness happening in the lab. They do not attest to hearing anything about the sex stereotyping comments. And we have Diane Trehanas herself admitting that her one co-worker only said that in front of other co-workers and didn't say it in front of any supervisor. And then, of course, we have Dr. Schultz purportedly making these same comments, but he is the supervisor and that's where the supervisor liability analysis comes in and how we get to Farragher-Ellerth. When the plaintiff went on FMLA leave in February, she lost her computer access to work, right? She did. Why was that? Apparently, it is protocol when you're going to be out for a period of time. And mind you, she was certified as being incapable of working, so she didn't need access to her computer. So what the district judge said basically this is not a big deal, okay? Yes. And I'm wondering what if I were gone for a month or two or three and didn't have access to the court computer system, I'd be fairly upset and distressed about that. What evidence allows us to resolve the insignificance or significance of that change as a matter of law on summary judgment? I would suggest, Your Honor, that it is the law that the district court cited to you, which is the law that sort of minor annoyances. I understand that law. The question is why is that just a minor annoyance as a matter of law? Because she's not in a position to work. She has been certified that she is incapable of working, and her initial certification is for some period of time between one and three months. It gets extended over a period of time. But she's been certified by a practitioner as being incapable of working, so she doesn't need access to her work. Did that deny her access to emails, for example? Correct. So normal communications with co-workers and so on would be cut off? Unless she has other ways of communicating with them. I mean, through her work email, potentially cut off? Yeah. Okay, thanks. You're welcome. You know, I will just touch briefly as we're talking about And that was a question related to the FMLA retaliation claim against the university. You know, I would just reiterate for the court that the standing issue has not been argued or developed in any significant way by E.J. Rose. So to what extent, I'm troubled by your argument and by the district court's treatment. It seems to completely blur the difference between merits and jurisdiction. On the standing issue? Yes. Well, in terms of was injury caused by the defendant. We usually think of that as part of a merits analysis. Well, I would argue, Your Honor, that this court's decision in Gracia versus Sigmatron that was decided just last year, militates and really compels this ruling on standing. So the issue is So who's the trier of fact on that issue? Well, the court on the undisputed evidence, right? So this isn't a credibility determination. Suppose it goes to trial. Does the court have the ability, does the judge have the ability to make findings of fact that may, for example, go counter to a jury or take the issue away from the jury? Because it goes to, quote, jurisdiction. Yes, I don't think we need to get to that question because what Gracia says is before you get to the merits, the court needs to look at the question of standing. And this is almost identical to Gracia. And in that case, the parties below and the court below didn't even raise the standing issue at all. And it was this court that said, hey, we don't think there's an injury here. And so we've got this threshold issue. The same is the case here as it relates to the only potentially traceable injury to Dr. Schultz's withdrawal of his support for her candidacy is her inability to gain admission to medical school. And the undisputed facts show that that letter had nothing to do with her inability to gain admission to medical school. And those are undisputed facts that show that standing as of the time of the close of evidence, close of discovery, standing no longer exists on the FMLA retaliation claim against Dr. Schultz. So in your view, every time the plaintiff fails to prove injury, a case should be dismissed for lack of jurisdiction? I think you've got troubles under Bell against Hood. Well, again, I don't think Bell against Hood is a case that Mr. DeRose or that Diane DeRose would argue. No, I know it hasn't been cited. It often isn't cited, but it is a decision of the Supreme Court. We would argue that Barassia controls. Thank you very much. Thank you. The case is taken under advisement. Thank you. Case number five.